Alan W. HOMSHER, Appellant–
Respondent,

v.

Vanessa S. HOMSHER, Appellee–
Petitioner.

No. 54A05–9612–CV–495.

Court of Appeals of Indiana.

April 22, 1997.

Ian A.T. McLean, Crawfordsville, for Appellant.

William A. Goebel, Goebel, McGaughey & Sosbe, Crawfordsville, for Appellee.

## OPINION

FRIEDLANDER, Judge.

Alan W. Homsher appeals from an August 14, 1996 order modifying his child support

obligation. He raises the following restated issues on appeal:

1. Did the trial court clearly err in finding that Alan continued to be voluntarily underemployed and in imputing income to him for purposes of determining his child support obligation?

2. Did the trial court abuse its discretion in admitting evidence of fault and considering such evidence when determining whether to grant Alan's petition to modify support?

We reverse and remand.

The trial court dissolved the marriage between Alan and Vanessa S. Homsher following a December 12, 1990 hearing on Vanessa's March 17, 1990 petition for dissolution. The court granted custody of the parties' minor children to Vanessa and ordered Alan to pay child support in the amount of $189.00 per week. The formal decree dissolving the marriage was entered January 16, 1991, and it provided in pertinent part:

The Court FURTHER FINDS that [Alan] shall pay $189.00 per week to the Clerk of the Montgomery Circuit Court for the support of the minor children beginning December 14, 1990, and a like sum each week thereafter during the minority of the children or until further order of the Court.

The support amount has been calculated based on [Alan] having an average weekly gross income of $356.00 from Cardinal Communications, $302.00 as an independent contractor and subtracting his $10.00 per week medical insurance payment for the insurance of the children leaving him with a total average weekly gross income of $648.00. The petitioner's average weekly income is $238.00 from Crawford Industries and $6.00 per week as a bowling secretary for a total average weekly gross income of $244.00. The parties['] total average weekly income is $892.00 with [Alan's] share of said income calculated at 72%[.] Pursuant to the Indiana Support Guidelines the support amount for two children at the parties' average weekly gross income is $209.00. Added to that is the child care expense of $54.00 for a total weekly support figure of $263.00. [Alan's]

share of this total weekly support amount is $189.00 per week.

*Record* at 11–12.

On February 25, 1991, Alan filed a petition to modify the divorce decree with regard to the order of support, alleging that, because he was no longer employed at Cardinal Communications and his income had decreased substantially as a result of this change in employment, there had been a change in circumstances so substantial and continuing as to make the previous order of support unreasonable. The trial court denied the petition. The court's May 8, 1991 order stated in pertinent part:

[T]he Court after having heard the evidence and being duly advised NOW FINDS that [Alan's] Petition To Modify Decree Relative To Support should be denied based on the fact that [Alan] has often had more than one job during the marriage, has proven that he could hold both jobs which he had in December of 1990 without any conflict between his jobs and has voluntarily underemployed himself. The Court finding no change of circumstances of a substantial and continuing nature denies [Alan's] petition.

* * *

IT IS THEREFORE ORDERED ADJUDGED AND DECREED by the Court that [Alan's] Petition To Modify Decree Relative To Support should be denied based on the fact that [Alan] has often had more than one job during the marriage, has proven that he could hold both jobs which he had in December of 1990 without any conflict between his jobs and has voluntarily underemployed himself. The Court finding no change of circumstances of a substantial and continuing nature denies [Alan's] petition.

*Record* at 20–21.

On May 31, 1995, Alan filed another petition to modify child support, again alleging that there had been changes in circumstances so substantial and continuing so as to make the December 12, 1990 decree unreasonable. He also filed a motion for change of judge. The court's chronological case sum-

mary indicates that Vanessa thereafter filed an affidavit for contempt, apparently as a result of Alan's failure to pay child support as ordered.

The trial court entered an order appointing a special judge, and a hearing on Alan's petition to modify child support and Vanessa's affidavit for contempt was held on March 4, 1996. The trial court admitted into evidence at the hearing a worksheet Alan had prepared which indicated that his child support obligation, based upon a gross weekly income of $450.00, should be $108.00 per week.

Alan also testified at the March 4, 1996 hearing with regard to his employment history. He testified that, at the time his child support obligation was set at $189.00 per week, he was earning a total of approximately $648.00 per week working full-time as a cable television installer for Cardinal Communications and part-time as an independent contractor in broadcast engineering for three stations in Crawfordsville and one in Greencastle, but that, during the marriage, his family was accustomed to living on his income of $350.00 to $380.00 per week. He claimed that he did not begin working in broadcast engineering until well after his separation from Vanessa, which occurred in March of either 1989 or 1990. Alan further testified that he no longer earned the amount of money that he had been making at the time of the dissolution and did not have the necessary skills to enable him to find employment that paid an amount comparable to what he had been making in December 1990.

Alan presented evidence that, since October 1994, he had earned approximately $450.00 per week from his employment at Lang Trucking in Crawfordsville. During 1995, he earned a total of only $184.20 working for Froedge's Inc., a local towing company. Alan testified that he had been fired from his job at Lang Trucking the week before the hearing, but that he was going to start a new job that afternoon as a truck driver for People Lease Incorporated, a firm operating out of South Carolina. Alan testified that he expected to make roughly $450.00 per week working for People Lease, but, because his pay would be based upon

what "the truck makes a week", *Record* at 35, his actual pay could vary.

Alan explained how his circumstances had changed since 1990 or 1991:

Due to the occupation of being a truck driver and the fact that I am on the road all the time I hate [sic, "had"?] to give up the broadcast engineering jobs that I had because I could not dedicate the time and be on call to them as I needed to be therefore there was a reduction in income there because I could not hold those positions. Uh I can not pull a regular rotation with Froedge's which is a local towing company because I'm on the road quite a bit and out of town and unable to maintain any any [sic] kind of a schedule with these other people. If they call me and I am in town I go help them but quite often I'm out of town.

*Record* at 49–50. He also explained his employment history, stating:

I voluntarily quit Cardinal to dedicate more time more hours to the broadcast engineering which in essence turned out to be anywhere from thirty to sixty hours a week until that did not provide enough income and then I went to work for MRS Printing (inaudible) in Indianapolis. And at the time I was trying to both that [sic] and keep up the broadcast engineering jobs and that didn't work out because I was out of town quite a bit with MRS Printing Erectors therefore I had to give up the uh broadcast engineering jobs in order to stay with MRS Printing Erectors. And I left them because there was not enough work uh they had me laid off for quite a bit of one summer. That's when I left them and went to work for Lang Trucking.

*Record* at 51.

Alan testified that, since 1991, there had never been a time when he had been voluntarily underemployed. He testified that Cardinal Communications, where he had worked as a cable television installer in 1990, had been sold and was no longer controlled from Crawfordsville. His testimony also revealed that there were likely no opportunities available to him as an independent contractor in

**1162**

the field of broadcast engineering in his geographical area because he had no professional training in the field and had worked only for small market stations who hired only part-time or contract engineers. He also testified that, because he could not earn enough money in the field of broadcast engineering, he was forced to take employment as a truck driver. In addition, Alan testified that he had never worked in a high tech industry and had no other experience that would allow him to get a job that paid more than he could make driving a truck. Moreover, because his truck driving duties required frequent out-of-town travel, he was unable to maintain regular employment either in broadcast engineering or working at Froedge's, Inc.

Alan also presented evidence that showed that his monthly expenses, including child support, exceeded his net income. He testified that he was in the process of filing bankruptcy due to his financial circumstances. Alan's wife, Kathy A. Homsher, testified at the hearing that she and Alan were experiencing financial difficulties, and they continually had to worry about whether their electricity was going to be shut off or whether they would be able to provide food for their own two young children.

Vanessa testified at the March 4, 1996 hearing that, at the time of the divorce, she was accustomed to living on Alan's income of $356.00 per week from Cardinal Communications and additional income from his part-time work at Froedge's. With regard to the issue of Alan's underemployment, Vanessa also testified, over objection, that Alan had testified at the December 12, 1990 hearing that he told his boss at Cardinal Communications that he could not afford to pay child support on what he was making and gave notice that he was quitting his job there.

Vanessa presented evidence that Alan owed her for a portion of their daughter's medical bills and testified with regard to support payments she had received in the previous 142 weeks. The court's chronological case summary indicates that, on May 23, 1996, the parties filed a stipulation to dismiss the affidavit of contempt.

On August 14, 1996, the trial court entered the order which is the subject of this appeal. It provided:

*ORDER MODIFYING SUPPORT*

1. [Alan] filed a Petition To Modify Child Support on May 31, 1995, alleging a change in circumstances so substantial and continuing as to make the Court's Order in the Decree of Dissolution entered January 16, 1991 unreasonable.

2. [Alan] previously filed a Petition to Clarify and/or Modify which was denied by the Court (Judge Milligan) on May 8, 1991.

3. [Alan] also filed a Motion for Change of Judge which was granted.

4. In the decree, the Court found that [Alan] had two sources of regular income—a job earning $356.00 (40 hour week) *and* $302.00 a week income as an independent contractor.

5. In the Order entered May 8, 1991, the Court clarified its decree stating in pertinent part:

". . . [Alan's] Petition to Modify Decree Relative To Support should be denied based on the fact that [Alan] has often had more than one job during the marriage, has proven that he could hold both jobs which he had in December of 1990 without any conflict between his jobs, and has voluntarily underemployed himself."

6. The issue for the Court now is whether or not [Alan] is capable of maintaining two (2) jobs as he did throughout the marriage.

7. The Court finds [Alan's] health is good and that he is capable of handling more than one job now—just as he did during the marriage. The Court finds [Alan] continues to be voluntarily underemployed. [Alan] quit his job as an independent contractor.

8. The Court does find that [Vanessa's] income has increased from $244 per week to $310 per week, less $12.00 per week for medical insurance for the children.

9. [Alan's] income on his 40 hour week job has increased from $350 per week to $448 per week.[1]

10. The Court finds that child support should be modified to reflect the increased income of [Vanessa] and [Alan]. [Vanessa's] average weekly gross income is $298. [Alan's] average weekly gross income for purposes of child support is $750 ($448 + $302). The parties' total average weekly income is $1048 with [Alan's] share of said income calculated at 72%. Pursuant to the Indiana Support Guidelines, the support amount of two (2) children based on the parties' average weekly gross income is $234.00. [Alan's] share of the weekly support amount is $169.00

IT IS ORDERED, ADJUDGE[D] AND DECREED by the Court that [Alan] shall pay child support in the amount of $169.00 per week. Child support shall be paid by an income withholding order issued by the Court.

The Court further Orders that [Alan] shall be responsible for 72% of all uninsured medical, dental, and optical expenses of the children, including expenses incurred at Charter Hospital after the first incurred annually by the children.[2]

The Court Orders [Alan] to pay $50.00 per week on the arrearage of medical expenses incurred by [Vanessa] on behalf of the children.

The modification of child support shall be effective January [illegible], 1996.

*Record* at 27–29.

1.

█ The trial court clearly erred in finding that Alan continued to be voluntarily underemployed and in imputing income to him for purposes of determining his child support obligations.

█ In reviewing a judgment supported by special findings of fact, we determine whether the evidence supports the findings and the findings support the judgment. *Owensby v. Lepper,* 666 N.E.2d 1251 (Ind.Ct. App.1996). On appeal of a claim tried by the court without a jury, the appellate court shall give due regard to the opportunity of the

---

1. Though not raised as an issue on appeal, we note that the trial court failed to deduct from Alan's gross income the cost of rearing the children of his subsequent marriage to Kathy. This was error. "Parents have the same duty to support later children as they do earlier children, and this Court will not prefer first children over subsequent children for purposes of support." *Haverstock v. Haverstock,* 599 N.E.2d 617, 619–620 (Ind.Ct.App.1992). See also Ind.Child Support Guideline 3(A)(4), which provides: "In determining a support order, there should be an adjustment to Weekly Gross Income of parents who have natural or legally adopted children living in their households that were born or adopted subsequent to the prior support order." Commentary 3 to Child Supp.G. 3(A) provides the computation necessary to make this adjustment. If, as here, there are two children living in the parent's household who were born subsequent to the prior support order, the parent's weekly gross income should be multiplied by .903 and the resulting figure should then be entered on the line provided on the worksheet for weekly gross income. *See id.*

2. The parties do not raise on appeal any allegation of error with regard to the computation of uninsured medical, dental, and optical expenses of the children, and, on the record before us, it is unclear whether Alan agreed to pay 72% of these expenses or whether the trial court, before ordering Alan to pay 72% of these expenses, considered that, with each support payment, Alan had already, in effect, prepaid a percentage of uninsured health care costs. If Alan did not agree to pay this amount and if the court did not take the prepayment into effect, the trial court erred in this regard. The figures found in the Guideline Schedules for Weekly Support Payments include six percent for ordinary uninsured health care costs. *See* Child Supp.G. 3(E). In effect, every time a support payment is made, the non-custodial parent is prepaying health care expenses. See Commentary 2(b) to Child Supp.G. 3(E), which provides in pertinent part:

> The data on which the Guideline Schedules are based included a component for ordinary medical expenses. Specifically, 6% (six percent) of the support amount is for health care expense. The noncustodial parent is, in effect, prepaying health care expenses every time a support payment is made. Consequently, the Guidelines require that the custodial parent bear the cost of health care expense up to six percent (6%) of the basic child support obligation found on line 4 of the worksheet. That computation is made by multiplying line 4 by 52 and multiplying the product of that multiplication by .06 to arrive at the amount the custodial parent must spend on the health care costs of the parties' children in any calendar year before the noncustodial parent is required to contribute more.

trial court to judge the credibility of witnesses and shall not set aside the trial court's findings or judgment unless they are clearly erroneous. Ind.Trial Rule 52(A). A judgment is clearly erroneous where, even though there is evidence to support the trial court's decision, our examination of the record leaves us with the firm conviction that a mistake has been made. *Owensby*, 666 N.E.2d 1251. In addition, we will reverse a trial court's determination whether child support should be modified only when there has been an abuse of discretion. *Elliott v. Elliott*, 634 N.E.2d 1345 (Ind.Ct.App.1994). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We are firmly convinced that a mistake has been made in this case and that the trial court's decision was clearly against the logic and effect of the facts and circumstances before it.

> The income shares model set forth in the Indiana Child Support Guidelines apportions the cost of children between the parents according to their means, and is based on the premise that children should receive the same portion of parental income after a dissolution that they would have received if the family had remained intact.

*In re the Marriage of Lang*, 668 N.E.2d 285, 289 (Ind.Ct.App.1996).

■ The Indiana Child Support Guidelines acknowledge that some parents may take drastic measures, such as becoming unemployed or underemployed, in an attempt to liberate themselves from their child support obligations. *Gilpin v. Gilpin*, 664 N.E.2d 766 (Ind.Ct.App.1996). In order to discourage such measures, the Guidelines give the trial court wide discretion to impute potential income to a parent when the court is convinced that the parent's unemployment or underemployment has been contrived for the sole purpose of evading support obligations. *Id. See also* Child Supp.G. 3(A)(3). To determine whether potential income should be imputed, the trial court should review the obligor's work history, occupational qualifications, prevailing job opportunities, and earning levels in the community. *Gilpin*, 664 N.E.2d 766. Likewise, "[a] determination of

potential income is made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." *In re the Marriage of Lang*, 668 N.E.2d at 289.

■ While some parents may become unemployed or underemployed in an attempt to relieve themselves of significant child support obligations, legitimate reasons may also exist for parents to leave employment or take a lower paying job, and child support orders are not to be used as a tool to promote a society where all work to their full economic potential or where parents are forced to base their career decisions strictly upon the size of potential paychecks. *Elliott*, 634 N.E.2d 1345; *In re the Matter of the Paternity of Buehler*, 576 N.E.2d 1354 (Ind.Ct.App.1991).

In our view, the practical effects of the August 14, 1996 order entered in this case were to require Alan to work well beyond his full economic potential and to base his career decisions solely upon his child support obligations. We recognize that Alan may have consistently held more than one job during the duration of his marriage to Vanessa, and we do not condone Alan's decision to quit his full-time job at Cardinal Communications in December 1990 and become voluntarily underemployed in an apparent attempt to evade a significant support obligation to his children. Nonetheless, Alan should not be penalized indefinitely for the exercise of poor judgment in 1990 and should therefore not be required to pay child support on imputed income when the record is clear that such income has not been available to him for a significant period of time and likely will not be available to him given his employment potential, probable earnings level based on his work history since at least 1994, occupational qualifications, and the prevailing job opportunities and earnings levels in his community. It may be fairly inferred from the record that, given Alan's circumstances, he likely would not have been able to maintain the level of income he enjoyed in December 1990 even if the family had remained intact.

The August 14, 1996 order modifying support is reversed. This case is remanded to

the trial court for a determination of Alan's child support obligation which is in accordance with the Guidelines. In making this determination, the trial court shall not include the $302.00 in imputed income which was based upon the court's determination that Alan was voluntarily underemployed. In addition, the court shall deduct from Alan's gross income the cost of rearing any of Alan's natural or legally adopted children living in his household who were born or adopted subsequent to the prior support order and shall consider the issue relating to the computation of uninsured health care costs raised in footnote two of this opinion and all other applicable considerations pursuant to the Guidelines.

### 2.

Because we are reversing the order modifying support, we need not address the issue whether the trial court erroneously considered evidence of fault when making its decision in this case.[3]

The August 14, 1996 order modifying support is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

SULLIVAN and KIRSCH, JJ., concur.

---

**3.** Fault is not a proper consideration when resolving the issues raised in this post-divorce pro- ceeding. *Lang,* 668 N.E.2d 285.