FILED

May 31 2016, 6:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jonathan M. Young
Newburgh, Indiana

ATTORNEYS FOR APPELLEE

Trisha S. Dudlo
Kelly A. Lonnberg
Bamberger Foreman Oswald &
Hahn, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tracy K. Barber,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Amy Henry,<br>*Appellee-Respondent.* | May 31, 2016<br><br>Court of Appeals Case No.<br>87A01-1510-JP-1639<br><br>Appeal from the Warrick Circuit<br>Court<br><br>The Honorable Greg A. Granger,<br>Judge<br><br>Trial Court Cause No.<br>87C01-1503-JP-47 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, Tracy K. Barber (Father), appeals the trial court's Order, granting Appellee-Petitioner's, Amy Henry (Mother), verified petition to modify foreign child support order.

We affirm, in part, reverse, in part, and remand with instructions.

## ISSUES

Father raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by calculating Mother's income at minimum wage when she is a medical doctor and has a historical income in excess of $150,000 but elects to stay at home with her children; and

(2) Whether the trial erred in concluding that Father was responsible for payment of expenses incurred prior to the filing of Mother's modification petition.

## FACTS AND PROCEDURAL HISTORY

Father is the natural parent of S.B., born on February 21, 1999. S.B. resides in Newburgh, Indiana with Mother, Mother's husband, Dr. Dan Henry (Dr. Henry), Mother's minor child from a prior marriage, C.R., aged 14, and Mother's and Dr. Henry's minor child, B.H, aged 7 at the time of the hearing. S.B. and B.H. have both been diagnosed with autism spectrum disorder, while C.R. has been diagnosed with attention deficit hyperactivity disorder.

[5] On August 1, 2001, the Fayette Circuit Court, in Kentucky, entered an Agreed Order, adopting the agreement between Father and Mother to establish joint legal custody of S.B., with Mother receiving sole physical custody and Father having "liberal visitation." (Appellant's Conf. App. p. 1). Father agreed to pay $230 per month towards child support. The Order reflected that "[b]oth parties acknowledge that this amount is less than required by the Kentucky Child Support Guidelines and knowingly waive the Guidelines' amount." (Appellant's Conf. App. p. 2).

[6] Mother is a doctor of osteopathic medicine; she graduated in 2001 and completed her residency in 2004. After residency, Mother shared a practice with her current husband until the practice "became overwhelming." (Transcript p. 22). In 2013, the practice was sold to Methodist Hospital in Henderson, and Mother remained employed by the hospital for another two years. Mother worked Monday through Thursday, from 9:00 a.m. until "the kids got out of school." (Tr. p. 22). After a while, Mother's employment was reduced to three days per week. She worked part-time at Henderson Minor Outpatient Clinic, and later reduced her hours to one shift per week, and eventually, to one shift per month. Mother made the decision to reduce her employment because the "therapy appointments" for S.B. and B.H. "were getting out of control." (Tr. p. 23). She stopped being employed altogether in December 2014.

[7] Initially, Mother reduced her hours when B.H. was diagnosed with autism spectrum disorder. B.H. had "therapy seven hours a week[,]" in addition to the

therapy at home. (Tr. p. 23). In the fall of 2013 and a month after B.H. was diagnosed, S.B. was similarly diagnosed with autism spectrum disorder. At first, S.B. only took social skills classes but due to his delayed diagnosis, the number of appointments increased because he "had to make up for a lot of lost time." (Tr. p. 24).

[8] On April 26, 2014, an incident involving S.B. at his Father's residence resulted in juvenile criminal charges filed against S.B. After the charges were filed, S.B. was placed on informal house arrest and suicide watch for about a month. As a term of S.B.'s informal house arrest, S.B. could not be left alone with any children or his siblings and needed constant supervision. Pursuant to the juvenile order, S.B. was referred for testing and evaluation by a specialist, located in Bloomington, Indiana. After pleading guilty, S.B. was placed on probation, with very strict guidelines, until his eighteenth birthday. The probation requirements include that S.B. can "never be unsupervised with anyone under the age of 14[,] is never to be placed in a supervisor position for any kids[, and] he should refrain from viewing pornography, or any type of materials of that matter." (Tr. p. 27). Furthermore, as a probation requirement at the recommendation of the specialist, S.B. was not to contact the victim or the victim's family, which included Father, until the victim and the family had received counseling. Father did not attend any of S.B.'s juvenile court hearings and, at the time of the trial court's hearing on the child support modification, had not yet undergone counseling. S.B. finished his court-ordered program at the end of May 2015.

[9] Because he was placed on probation, Mother started homeschooling S.B in September of 2014. She hired a life coach to help S.B. with his home school requirements, an algebra tutor, as well as an algebra teacher. S.B. was able to attend home room at Castle High School in the Warrick County School system for a semester starting January 2015 "just to get acquainted with the people while he is learning these skills that he needs" and "with the intention that he would integrate in the fall of 2015." (Tr. pp. 30, 51). S.B. returned to school fulltime in the fall semester of 2015. Between S.B.'s court ordered treatments, the two boys' social skills classes, and the three boys' therapy appointments, Mother has not been able to obtain employment in her profession.

[10] Dr. Henry, Mother's current husband and father to B.H., is a pulmonary physician at Deaconess Hospital. Due to the needs of the three children, Dr. Henry changed his work from critical care medicine to the sleep lab to "have a more fixed schedule." (Tr. p. 103). His "base salary will go down significantly but it will allow [him] a lot more time at home." (Tr. p. 104). Dr. Henry also committed to working one day per week at Veteran's Affairs to obtain better health insurance for the children's treatments. Despite the insurance coverage, the family carries "a significant amount of uninsured medical expenses." (Tr. p. 106). Dr. Henry "took off work all the days that [S.B.] was in court and was [] there. [H]e was there for numerous social workers visits when the Department of Children Services had to come to [the] home. [H]e helped with all the appointments[.]" (Tr. p. 43). "He has lost wages, he has lost skills, expertise, and respect." (Tr. p. 43).

[11]    Father is employed at Dana Corporation as a safety manager. He earned a salary of approximately $97,500 in 2015, which included a $6,000 bonus. He currently resides with his fiancé, who pays one-half of the mortgage, utilities, and food. Father pays $170 per month in child support for a subsequent born child and is also saving $800 per month for his upcoming nuptials.

[12]    One year after the incident that resulted in S.B.'s probation, Father contacted S.B. by text message. Mother felt compelled to seek a protective order against Father. On March 5, 2015, Mother filled her petition for an order for protection and request for a hearing filed on behalf of a child. On March 31, 2015, Mother filed a petition to transfer jurisdiction and register foreign order, as well as a verified petition to modify foreign child support order. On April 8, 2015, the trial court assumed jurisdiction and registered the order issued in Kentucky. On April 24, 2015, Father filed his response to Mother's pleadings, as well as a verified information for contempt and a petition to modify parenting time. On August 25, 2015, the parties submitted a Partial Agreed Order to the trial court, agreeing, in pertinent part, to the following:

1. The parties agree and stipulate that [the trial court] is the proper jurisdiction for this juvenile paternity matter.

2. The Father shall set up his own therapy sessions through a reunification therapist of his choice and at his expense, recommended or approved by [the Bloomington specialist appointed in the juvenile matter].

3. The child shall continue with his existing therapist on the issue they are currently working on, and in addition [S.B's]

therapist shall be authorized to communicate with the Father's therapist to form an agreement regarding initial reunification meetings and how to handle them.

4. Once the therapists agree that it is appropriate, Father and [S.B.] will participate in parenting time at the Parenting Time Center in Evansville[,] Indiana at the Father's expense, for so long as the therapists jointly agree that said supervised sessions are appropriate.

5. When the therapists agree that the supervised sessions have been going well and it is appropriate to move forward, the parties shall move forward on to alternate weekend parenting time with Father in public locations, for 3 to 4 hours.

6. The Father shall have no contact with the minor child other than through this process of work with the therapists and initially via supervision.

* * * *

9. After supervision ends, exchanges of the child for parenting time shall take place at a neutral location. Neither party shall go to the other party's property.

10. The Mother's request for protective order is hereby withdrawn, with the exception of her request for reimbursement of expenses.

(Appellant's App. pp. 20-21).

[13] Also, on August 25, 2015, the trial court conducted a hearing on the remaining issues and entered its Order on September 23, 2015, concluding, in pertinent part:

> 8. [Mother], when she was employed in private practice, had earned in some years in excess of $150,000.00. [Mother] is currently not employed outside of her maternal and spousal duties to care for and raise her children and step-children.[1]

> 9. Mother's son, [S.B.], and her stepson[2], [B.H.], as special needs individuals require supervision, guidance, and assistance above what is required for child[ren] who are not special needs.

> 10. Mother's current employment situation is not a choice made to avoid any child support obligation, and is not due to an effort to avoid the payment of any child support obligation. Furthermore, Mother's spouse's significant income has not contributed to Mother's decision not to be employed. In summary, [Mother's] unemployment is not contrived.

> 11. As a result of a juvenile delinquency petition involving [S.B.], Mother has incurred certain expenses for which she seeks contribution from [Father].

---

[1] Although the trial court references step-children, the record and Mother's own testimony clearly reflects that all three children are her biological children.

[2] Again, although the trial court refers to B.H. as Mother's step-son, Mother's own testimony unequivocally establishes that B.H. is her biological son and the child of the marriage between Mother and Dr. Henry.

12. The [c]ourt finds that [Father] is to pay [Mother] the sum of $14,140.46 as his contribution to Mother's expenses incurred for [S.B.].

13. The [c]ourt, having received testimony and evidence concerning the income and resources available to the parties, determines that Father shall pay child support in the amount of $262.00 a week beginning September 25, 2015, pursuant to the Child Support Worksheet attached to and incorporated into this Order. Mother is to pay the first $873.60 of uninsured health care expense, and thereafter Father is to pay 88.45% and Mother 11.55% of uninsured health care expenses.

(Appellant's App. pp. 5-6).

[14] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[15] Decisions regarding child support rest within the sound discretion of the trial court. *Taylor v. Taylor*, 42 N.E.3d 981, 986 (Ind. Ct. App. 2015), *trans. denied*. Thus, we reverse child support determinations only if the trial court abused its discretion or made a determination that is contrary to law. *Id*. An abuse of discretion occurs only when the decision is clearly against the logic and effect of the facts and circumstances before the court, including any reasonable inferences therefrom. *Hooker v. Hooker*, 15 N.E.3d 1103, 1105 (Ind. Ct. App. 2014). Whether the standard of review is phrased as "abuse of discretion" or "clear error," the importance of first-person observation and preventing

disruption to the family setting justifies deference to the trial court. *Id.* (citing *MacLafferty v. MacLafferty*, 829 N.E.1d 938, 940-41 (Ind. 2005)).

## II. *Minimum Wage*

[16] Father disputes the trial court's modification of his support obligation for S.B. Following the determination of paternity, the court may order either or both parents to pay any reasonable amount for child support. I.C. § 31-14-11-1.1. A child support order in a paternity proceeding is subject to the provisions of Ind. Code section 31-16-8-1. *See* I.C. § 31-14-11-2.3 ("A child support order issued under this chapter is subject to the provisions in [I.C. §] 31-16-6 through [I.C. §] 31-16-13"). Accordingly, "[p]rovisions of an order with respect to child support . . . may be modified or revoked." I.C. § 31-16-8-1; *In re Paternity of M.R.A.*, 41 N.E.3d 287, 294 (Ind. Ct. App. 2015). Except as provided in another statute which is not applicable here, a modification to an existing order for child support may be made only:

> (1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or
>
> (2) upon a showing that :
>
> > (A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered applying the child support guidelines; and

(B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

I.C. § 31-16-8-1(b). The party seeking to modify a child support order bears the burden of establishing that the statutory requirements have been met. *Hooker*, 15 N.E.3d at 1105.

[17] Here, Father's contention is not the modification of child support *per se*, but rather the trial court's calculation. More specifically, Father's challenge is focused on the court's imputation of minimum wage as Mother's income, while Mother has a medical degree and has been employed as a physician before. Father assures us that he "is not asking that Mother make employment decisions based upon obtaining the highest pay[;]" rather "he is just asking that the [c]ourt fairly allocate support where the Mother has admittedly chosen not to work based upon her husband's substantial income." (Appellant's Br. p. 11).

[18] Trial courts may impute income to a parent for purposes of calculating child support upon determining that he or she is voluntarily unemployed or underemployed. *Matter of Paternity of Buehler*, 576 N.E.2d 1354, 1355-56 (Ind. Ct. App. 1991). The Child Support Guidelines permit imputation to discourage parents—both the payor non-custodial parent and the recipient-custodial parent—from avoiding significant child support obligations by becoming unemployed or taking a lower paying job. *See id*. But the Guidelines do not require or encourage parents to make career decisions based strictly upon the size of potential paychecks, nor do the Guidelines require that parents work to

their full economic potential. *Id.* "It is not our function . . . to approve or disapprove of the lifestyle of [parents] or their career choices and the means by which they choose to discharge their obligations in general." *Id.* "To determine whether potential income should be imputed, the trial court should review the obligor's work history, occupational qualifications, prevailing job opportunities, and earning levels in the community." *Homsher v. Homsher*, 678 N.E.2d 1159, 1164 (Ind. Ct. App, 1997).

[19] A review of the record leaves us convinced that Mother is unemployed with just cause. The record reflects that, starting in 2013, Mother's employment gradually reduced. Although she was in fulltime employment with Methodist Hospital, progressively her hours were reduced, initially to three days per week and eventually to only one shift per month. She stopped being employed altogether in December 2014. Mother's reduction in employment coincided with the diagnosis of B.H. and S.B. and the corresponding increase of appointments "to make up for lost time" of a delayed identification of S.B.'s autism. After the incident at Father's residence in April 2014 and the imposition of probationary requirements by the juvenile court, S.B. was placed on house arrest. He became "attached to [Mother's] hip for about two months, [she] could not leave [the] children alone even in the same room." (Tr. p. 26). The juvenile court required testing and even more therapy, which will remain in place until S.B. is 18 years old. Because S.B. was placed on house arrest, Mother started homeschooling S.B. in September of 2014 with the help of private tutors. In January 2015, S.B. started attending home room at Castle

High School with intent to transition him into fulltime school in the fall semester of 2015.

[20] Besides S.B.'s court ordered treatments and requirements, Mother takes S.B. and B.H. to social skills classes, and all three boys to their therapy appointments. At the time of the hearing, all three children were enrolled in school fulltime. Mother, with the help of Dr. Henry, gets the boys ready in the morning and Dr. Henry drops them off at school. A normal school day ends at 2:15 p.m. Two days a week, Mother picks up B.H. early for therapy and every three months she takes B.H. for a dental appointment. In addition, B.H. has soccer practice twice a week and at-home therapy, which started on an hourly basis. S.B. has an appointment with his therapist every other week, and his psychiatrist every other month. He has social skills classes once a week after school and an Individualized Educational Plan (IEP), which requires extra "communication between [Mother] and the teachers." (Tr. p. 64). C.R., the middle child, sees a psychiatrist every three months.

[21] Mother has applied for respite care and has been approved. However, the agency appointed for the care has yet to fulfill the hourly obligation. Due to the needs of the three children, Dr. Henry changed his medical specialty to have a more fixed schedule. This career choice came with a significant decrease in his base salary in exchange for "a lot more time at home." (Tr. p. 104).

[22] Based on the particular facts and circumstances before us, the trial court properly concluded that "Mother's current employment situation is not a choice

made to avoid any child support obligation[.]" (Appellant's App. p. 5). A highly educated parent who chooses to leave her employment to help her three children with special developmental needs is not unemployed without just cause. Although Dr. Henry is in an enviable affluent position to give Mother and the children a more comfortable life, this is not Mother's main reason for not working. Rather, Mother's life revolves around her three minor sons and their therapy, and is focused on getting them the best care she can give them so they may each reach their full potential. It is not our function to "force parents to work to their full economic potential or make their career decisions based strictly upon the size of potential paychecks." *Buehler*, 576 N.E.2d at 1356. Although the trial court could have imputed no income to Mother, here, the trial court allotted Mother the minimum income in its calculation of child support. "While the Guidelines clearly indicate that a parent's avoidance of child support is grounds for imputing potential income, it is not a necessary prerequisite." *In re Paternity of Pickett*, 44 N.E.3d 756, 766 (Ind. Ct. App. 2015). Instead, "it is within the trial court's discretion to impute potential income even under circumstances where avoiding child support is not the reason for a parent's unemployment." *Id*. Accordingly, the trial court did not abuse its discretion in its calculation of the weekly child support.

### III. *Payment of Expenses*

[23] Next, Father contends that the trial court erred when it required Father to reimburse Mother for "certain expenses" she incurred "[a]s a result of a juvenile delinquency petition involving S.B." in the amount of $14,140.46. (Appellant's

App. p. 5). Father relies on the initial child support order issued by the Kentucky court, which did not include a provision for medical expenses, to maintain that he is not obligated to pay for medical, counseling, and other expenses related to S.B.'s juvenile case.

[24] On March 5, 2015, Mother filed a petition for an order of protection.[3] On the petition, Mother checked "the box requesting an order for [Father] to reimburse [Mother] and or the child [] who need protection for expenses related to the basis of the protective order." (Tr. p. 95). On April 1, 2015, Mother supplemented the petition by specifically requesting "reimbursement for medical expenses, counseling expenses and other costs[.]" (Tr. p. 96). At the beginning of the hearing on August 25, 2015, the parties presented a Partial Agreed Order to the trial court, which stipulated:

> 10. The Mother's request for protective order is hereby withdrawn, with the exception of her request for reimbursement of expenses.
>
> 11. The [c]ourt now hears evidence regarding the remaining issues not agreed upon by the parties, and takes these remaining issues under advisement, those being child support, uninsured medical expenses, retroactive child support, retroactive uninsured medical expenses, *other expenses submitted by Mother under the*

---

[3] The parties did not include the petition for the protective order or its supplement in their respective appendices. We will therefore rely on the transcript to infer their contents.

*protective order petition for reimbursement*, and the Mother's request for attorney fees.

(Appellant's App. pp. 21-22) (emphasis added). During the presentation of this Partial Agreed Order to the trial court, Mother clarified:

> We are not asking for a protective order going forward, but our petition for protective order requested [] reimbursement of the expenses that [Mother] incurred as a result of these incidents [under the juvenile cause] and we continue to make that request. So it's a child support going forward, child support retroactive to our petition, [] and other expenses.

(Tr. p. 16). After Father agreed with this elaboration of the Partial Agreed Order, the trial court accepted the terms.

[25] While Father is correct that the initial child support order does not include a provision for medical and counseling costs; he nevertheless agreed to the reimbursement of his share of these expenses, as related to S.B.'s juvenile cause, through the Partial Agreed Order accepted by the trial court on August 25, 2015. Because Father agreed, he waived the issue for our review and cannot now be heard to complain.[4]

[26] Next, contesting the amount of the reimbursement, Father claims that Mother's expenses were unreasonable. During trial, Mother testified that the total

---

[4] Because we conclude that the reimbursement of the disputed costs were agreed upon in the Partial Agreed Order, we do not address Father's related argument that the reimbursement of the particular costs cannot be based upon the Indiana Civil Protection Order Act. *See* I.C. § 34-26-5-9(c).

amount of out-of-pocket expenses related to S.B.'s juvenile cause was $28,280.92. In its Order, the trial court ordered Father to reimburse half, or $14,140.46.

[27] Father contends that Mother sought reimbursement of counseling expenses, tutoring expenses and therapeutic evaluations of which Mother did not seek Father's input or agreement before incurring these. The record reflects that one of the probationary requirements of the juvenile cause included the prohibition of contacting the victim or the victim's family, of which Father was part, before they had undergone counseling. As Father had yet to undergo counseling at the time of the custody modification hearing, Mother was not in a position to consult Father before incurring the expenses.

[28] Secondly, Father objects to the expenses because "Mother's husband paid the expenses." (Appellant's Br. p. 15). While Father explicitly testified that it is Dr. "Henry's responsibilities to pay those expenses" for S.B., S.B. is Father's son, not Dr. Henry's child. (Tr. p. 155). The testimony reflects that all expenses were expenses incurred for S.B. as a result of the incident related to the juvenile cause. Because Dr. Henry is the only adult employed in Mother's household, it is understandable that he paid for those expenses. Accordingly, a reimbursement would not be a windfall for Dr. Henry as he was not the parent responsible for payment of half of those expenses.

[29] Lastly, Father disputes the amount of "Attorney fees – civil" in the total amount of $14,018.00. (Mother's Exh. 1). Contesting the lack of detail in the

amount of attorney fees, he rejects the reasonableness of the reimbursement. In response, Mother asserts that "the trial court also granted payment of half of [Mother's] attorney fees." (Appellee's Br. p. 22). However, the trial court's Order, issued September 23, 2015, is silent with respect to attorney fees. The only expenses alluded to by the trial court are "the certain expenses" Mother "has incurred" as a result "of a juvenile delinquency petition involving S.B.[;]" the trial court did not explicitly grant attorney fees in the child support proceeding. (Tr. p. 5).

[30] Nevertheless, pursuant to the Partial Agreed Order, the parties agreed to submit the issue of reimbursement of "other expenses submitted by Mother under the protective order petition" to the trial court. (Appellant's App. p. 22). The Indiana Civil Protection statute, which governs the issuance of protective orders, specifies that a court may order a party to pay attorney's fees. I.C. § 34-26-5-9(c)(3)(A). Accordingly, as "other expenses" is not further detailed, we infer that these may include the statutorily awarded attorney's fees. Thus, in the absence of a specific grant of attorney fees for the support modification, only the attorney fees pertaining to the protective order can be reimbursed.

[31] At trial, Mother submitted a summary exhibit with a general outline of her expenses, which included the reference of the civil attorney fees in the amount of $14,018.22. She also presented the trial court with a "Ledger Report," which specified total amounts of daily attorney fees incurred in "Issues regarding [S.B.]" (Mother's Exh. 1, tab B). The Ledger Report fails to include details such as the type of work, hourly or fixed, amount of time spent. The trial court

admitted the Ledger Report "as a demonstrative exhibit," with Father's reservation that he would receive an itemized billing. The record does not include evidence establishing that Father ever received the itemized billing statement. Accordingly, we reverse the trial court's order with respect to the civil attorney fees and remand with instructions to determine which part of the total amount claimed can be attributed to the protective order petition.

## CONCLUSION

[32] Based on the foregoing, we conclude that trial court did not abuse its discretion when it imputed minimum wage to Mother after concluding that she was not voluntarily unemployed. We reverse the trial court with respect to the award of civil attorney fees and remand with instructions to determine which portion of these fees can be attributed to the protective order. We affirm the trial court with respect to all other reimbursement expenses.

[33] Affirmed in part, reversed in part, and remanded with further instructions.

[34] Kirsch, J. and Pyle, J. concur