# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 18 2020, 5:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephen P. Rothberg
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Katherine Ridenour
Paul R. Sturm
Shambaugh Kast Beck & Williams, LLP
Fort Wayne, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Leah Johnson, *Appellant,* | February 18, 2020 |
| v. | Court of Appeals Case No. 19A-DC-827 |
| | Appeal from the Allen Superior Court |
| Justin W. Johnson, *Appellee.* | The Honorable Charles F. Pratt, Judge |
| | Trial Court Cause No. 02D08-1701-DC-32 |

**Pyle, Judge.**

# Statement of the Case

Leah Johnson ("Wife") appeals the trial court's denial of her motion to correct error filed with respect to the dissolution of her marriage to Justin Johnson ("Husband"). Wife specifically argues that the trial court abused its discretion when it: (1) determined Husband's child support obligation; (2) valued Husband's General Motors ("GM") Personal Savings Plan ("PSP"); (3) failed to provide sufficient information for the division of Husband's PSP; and (4) distributed the parties' property. Concluding that the trial court did not abuse its discretion, we affirm the trial court's judgment.[1]

We affirm.

# Issues

1.  Whether the trial court abused its discretion in determining Husband's child support obligation.

2.  Whether the trial court abused its discretion when it valued Husband's PSP.

3.  Whether the trial court abused its discretion by failing to provide sufficient information for the division of Husband's PSP.

4.  Whether the trial court abused its discretion when it distributed the parties' property.

---

[1] Wife has filed a motion for oral argument. We deny the motion by separate order.

# Facts

[3] Husband and Wife were married in 2003. They are the parents of two children, daughter, V.J. ("V.J."), who was born in December 2003, and son, A.J., ("A.J."), who was born in December 2005. Both Husband and Wife worked at GM.

[4] Husband and Wife got into an argument on Christmas Day 2016. Wife went out to Husband's car and rummaged through it. She found a bag with an unopened bottle of whiskey that someone had given Husband for Christmas, brought the bag into the house, dumped it on the floor, and told V.J. and A.J. that their father was an alcoholic. When Wife returned to Husband's car and started pulling things out of it, Husband attempted to pull her out of the car. Husband told Wife that he wanted a divorce, and Wife responded that that was fine and that she was "gonna put [him] in jail cause [he had] put [his] hands on her." (Tr. Vol. 2 at 156). Wife called the police and told them that Husband had grabbed her and that he had a gun. Husband waited in the garage. When three police cars arrived, the officers exited their cars with their hands on their guns. When the officers asked Husband if he had a gun, he responded that he had a gun and a permit that were inside the house. Husband left the house that night and went to his parents' house.

[5] In January 2017, Wife filed a petition to dissolve the parties' marriage. Two weeks later, Husband obtained a protective order for the following reasons:

Because [Wife] started harassing [him] through texts, calling, messages. [He] started getting messages from different accounts that people were trying to change [his] passwords. So [he] assumed it was her. And then . . . [he] got a message from On-star, which [he] had shut off a year before, saying that it had been turned on. So then [he] found out through On-star that it had been turned on through [Wife's] phone and that she was able to actively follow [him] through her phone and see where [his] location was, which she had been doing. She knew every – she told [him] over the phone where [he] had been going, what apartment place, what stores, you know, that she knew where [he] was at. And . . . then it culminated in she was following [him] in the car. She broke into [his] car at a gas station and took several items. And [he] just knew it was gonna continue so [he] felt – threatened. [He] didn't know what she was capable of and, uh, that – that was part of why [he] filed it.

(Tr. Vol. 2 at 158).

[6]     In January and February 2017, Husband saw V.J. regularly for overnight visits and talked to her every day on the telephone. Wife frequently took V.J.'s cell phone as punishment, and V.J. had to go to the office at school to telephone Husband. Beginning in March 2017, Husband felt like "he was being blocked, like [he] couldn't gain access to the kids." (Tr. Vol. 2 at 160). He eventually dismissed the protective order that same month. Shortly after the dismissal, Wife sent Husband a text "saying that [they] should bet back together." (Tr. Vol. 2 at 160). Husband did not respond to the text.

[7]     In April 2017, the trial court issued a provisional order, which granted Husband parenting time pursuant to the Indiana Parenting Time Guidelines. The order specifically stated that Husband's "midweek parenting time shall be overnight

so long as he provides appropriate childcare when he is working 3rd shift."
(App. Vol. 2 at 27). The trial court also awarded Husband parenting time credit for 143 overnight visits and ordered Husband to pay Wife $158 per week in child support.

[8] After the provisional order was issued in April 2017, Husband had regular overnight parenting time with V.J. and A.J. until June 2017. At the end of June, Wife accused Husband of molesting V.J. Because of these allegations, V.J.'s counselor recommended that Husband step back from parenting time and overnight visits. Husband followed the counselor's recommendation, leading to fewer overnight visits with V.J. V.J.'s counselor also recommended that Husband see a specific counselor. At the time of the dissolution hearing, Husband was still seeing his counselor and was following the recommendations of both his and V.J.'s counselors.

[9] The trial court held a hearing on the dissolution petition in July 2018. At the beginning of the hearing, the parties tendered to the trial court their stipulations. Stipulation Number 10 provides, in relevant part, as follows:

> The marital estate subject of distribution consists of certain assets and debts to which the parties stipulate as follows:
>
> *   *   *
>
> c) [GM] Personal Savings Plan . . . in husband's name   $52,925

(Father's App. Vol. 2 at 11).

[10]     In regard to the couple's finances, Wife testified that Husband had taken care of the finances and had paid the bills during the course of the marriage. As far as Wife knew, both her paycheck and Husband's paycheck had been direct deposited into an account at Midwest America Federal Credit Union ("the Midwest account") and had been used to pay bills. According to Wife, she used a debit card to make purchases on the account but never verified how much money was in the account because that "wasn't [her] responsibility." (Tr. Vol. 2 at 70). At the time of the hearing, Wife was aware that Husband also had a Chase account ("the Chase account).

[11]     Husband elaborated that he had opened the Chase account in 2015. Husband's GM paycheck was deposited directly into the Chase account. However, according to Husband, "most of the . . . paycheck deposited into [his] Chase account found its way into the Midwest account[,]" which was the account that he used to pay most of the family's bills. (Tr. Vol. 2 at 226). Husband specifically explained that he often took cash out of the Chase account and deposited those funds into the Midwest account. Husband also explained that he had also paid bills, such as $35,000 of mortgage payments, from the Chase account. Husband further testified that he did not have additional cash in a bank account or at his house and that he had not transferred cash or assets to anyone. Husband asked the trial court to issue a qualified domestic relations order "QDRO" to award Wife the portion of his PSP to which she was entitled.

[12]     Regarding his gross weekly wage for child support purposes, Husband testified that he was a third shift team leader at GM and that he had earned overtime

pay at GM in the past. However, Husband further explained that overtime had "been cancelled because [GM was] running a new model and they [were] not up to full production[.]" (Tr. Vol. 2 at 153). Husband further explained that he had previously received an $11,750 employment performance bonus but that bonuses were not guaranteed from year to year. According to Husband, Wife had received a bonus in the past as well.

[13] Additional testimony at the dissolution hearing revealed a tumultuous relationship between the parties. For example, Wife admitted that, during the pendency of the proceedings, she had broken into Husband's car several times and had taken: (1) notes from Husband's conference with his attorney; (2) Husband's car registration; (3) his lunchbox, and (4) several CD's. Wife also admitted that she had called the police on Husband "about six (6) times" and had burned Husband's personal property in a fireplace while roasting marshmallows with her children. (Tr. Vol. 2 at 77).

[14] Wife further admitted that she had told Husband that she did not "want him in [their] children's lives," and that when Husband had arrived to pick up his children for parenting time, Wife had told him to "get off [her] property" before she called her attorney and the police. (Tr. Vol. 2 at 80, 81). Wife had also required Husband to wait at the end of her street when he picked up A.J. for parenting time. Wife then made her son walk to the end of the block to meet his father.

[15] Wife also admitted that she had accused Husband of inappropriately touching V.J. and that she had told V.J.'s therapist that Husband could have inappropriately touched V.J. "based on how [V.J.] was acting[.]" (Tr. Vol. 2 at 91). Wife further testified that Husband had not regularly exercised parenting time with V.J. for the previous year. In addition, according to Wife, Husband had exercised intermittent parenting time with A.J. during the pendency of the proceedings.

[16] Husband testified that although the provisional order had authorized him to provide appropriate child care when he was working third shift, Wife "would not accept anyone that [he] had for watching [his] children," including paternal grandparents or Husband's twenty-three-year-old nephew who is a paramedic. (Tr. Vol. 2 at 176). According to Husband, Wife had never approved of any of his childcare providers.

[17] At the end of the hearing, Wife submitted a post-trial brief wherein she alleged that Husband had deposited in the Chase account, "nearly $18,000 in 'cash' [which] was unaccounted for[.]" (Wife's App. Vol. 2 at 45). According to Wife, Husband had "decided that dividing the assets of the marital estate in half was not to his liking, and therefore set out to secure his own 'nest egg' in the likely event the marriage was to end[.]" (Wife's App. Vol. 2 at 46).

[18] In October 2018, the trial court issued a detailed eight-page dissolution order, which: (1) excluded overtime and bonuses in its determination of Husband's gross weekly wage; (2) did not order Husband to reimburse Mother for the

parenting time credit he was awarded in the provisional order; and (3) valued Husband's GM PSP at $52,925.  The dissolution order also awarded Wife 49% of the marital couverture value of Husband's PSP and ordered the division of Husband's PSP through a Qualified Domestic Relations Order prepared by Husband's counsel.  Lastly, the trial court found that the presumption favoring an equal division of the marital estate was just and reasonable.  The following month, Wife filed a motion to correct error, which the trial court denied in part.[2]  Wife now appeals the denial.

# Decision

[19] Wife appeals the trial court's denial of her motion to correct error.  Our standard of review in such cases is well-established.  We review a trial court's ruling on a motion to correct error for an abuse of discretion.  *Old Utica School Preservation, Inc. v. Utica Tp.*, 7 N.E.3d 327, 330 (Ind. Ct. App. 2014), *trans. denied.*

[20] Wife specifically argues that the trial court abused its discretion when it:  (1) determined Husband's child support obligation; (2) valued Husband's PSP; (3) did not provide sufficient information for the division of Husband's PSP; and (4) distributed the parties' property.  We address each of her contentions in turn.

---

[2] The trial court granted to the motion in part to correct transposed terms.

## 1. Determination of Child Support

Wife first argues that the trial court abused its discretion in determining child support. A trial court's calculation of child support is presumed valid, and we will review its decision only for an abuse of discretion. *Thompson v. Thompson*, 811 N.E.2d 888, 924 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion occurs only when the decision is clearly against the logic and effect of the facts and circumstances before the court, including any reasonable inferences to be drawn therefrom. *Barber v. Henry*, 55 N.E.3d 844, 850 (Ind. Ct. App. 2016). The importance of the first-person observation and the prevention of disruption to the family setting justifies the deference given to the trial court in its child support determinations. *Id.*

In regard to the determination of child support, Wife argues that the trial court abused its discretion in two ways. Specifically, Wife first contends that the trial court abused its discretion when it excluded Husband's overtime wages and bonuses in its determination of his gross weekly wage. Overtime compensation and bonuses are both includable in the total income approach taken by the guidelines. Ind.Child Support Guideline 3 (Commentary 2.b). However, the includability of overtime wages and bonuses in the noncustodial parent's income is a fact sensitive matter, and it is not the intent of the guidelines to require a party who has worked overtime to continue doing so indefinitely just to meet a support obligation based on that higher level of earnings. *Id.*

Here, our review of the evidence reveals that Husband testified that overtime had been cancelled at GM because the company was running a new model and

was not up to full production. Husband also testified that although he had previously received an employment performance bonus, performance bonuses was not guaranteed from year to year. Based on this evidence, the trial court chose to exclude overtime and bonuses from its determination of Husband's gross weekly wage. We find no abuse of the trial court's discretion.

[24] Second, Wife argues that the trial court abused its discretion when it failed to order Husband to reimburse her for the parenting time credit he had been awarded in the provisional order. Wife specifically points out that the Husband received parenting time credit based on 143 overnight visits. According to Wife, because Husband did not exercise 143 overnight visits with the children, he should reimburse her for the parenting time credit that he received.

[25] Wife, however, has failed to set forth, both at trial and on appeal, the number of overnight visits Father exercised and the amount of reimbursement she is seeking. Her failure to support her arguments with record evidence results in waiver of the issue on appeal. *See e.g., Pierce v. State,* 29 N.E.3d 1258, 1267 (Ind. 2015) (explaining that a litigant who fails to support his arguments with appropriate citations to authority and record evidence waives those arguments for appellate review).

[26] Waiver notwithstanding, we find no abuse of the trial court's discretion. Indiana Child Support Guideline 6 provides that a "credit should be awarded for the number of overnights each year that the child[ren] spend with the noncustodial parent." The commentary to the guidelines further explains that

the granting of the credit is based on the expectation that the parties will comply with the parenting time order, and a parent who does not carry out the parenting time obligation *may* be subject to a reduction or loss of the credit, financial restitution, or any other appropriate remedy. (Emphasis added).

[27] The use of the word "may" in the commentary to the child support guidelines expresses an intent to vest the trial court with the discretion to determine whether it will order a certain result. *See e.g., Ind. Civil Liberties Union v. Ind. Gen. Assembly*, 512 N.E.2d 432, 433 (Ind. Ct. App. 1987). Further, our review of the evidence reveals that the provisional order awarded Husband parenting time credit for 143 overnight visits. After the provisional order was issued in April 2017, Husband had regular overnight visits with both V.J. and A.J. until June 2017. At that time, Wife accused Husband of molesting V.J. Because of these unsubstantiated allegations, V.J.'s counselor recommended that Husband step back from parenting time and overnight visits. Husband followed the counselor's recommendation, leading to fewer overnight visits.

[28] In addition, Wife also contributed in other ways to Husband having fewer overnight visits with his children. For example, although the provisional order authorized Husband to provide appropriate childcare for the children during overnight visits while he was working third shift, Wife never approved of any of his childcare providers, including paternal grandparents and Husband's nephew who is a paramedic. In addition, Mother told Husband that she did not want him in their children's lives, she told the children that Husband was an alcoholic, and she burned Husband's personal property in a fireplace while

roasting marshmallows with her children. Wife's denigration of Husband in the presence of their children appears to have led the children to pull away from Husband, which also resulted in fewer overnight visits.

[29] Wife cannot create conditions that result in their children having fewer overnight visits with Husband and then request reimbursement for a credit for the overnight visits that Husband did not exercise. The trial court did not abuse its discretion when it did not order Husband to reimburse Wife for the parenting time credit he had been awarded in the provisional order.

## 2. Valuation of Husband's PSP

[30] Wife also argues that the trial court abused its discretion when it valued Husband's PSP at $52,925. However, our review of the evidence reveals that Husband and Wife stipulated at the beginning of the dissolution hearing that the value of Husband's PSP was $52,925. This Court has previously explained that parties entering into a stipulation are bound to the facts so stipulated. *Wittwer v. Wittwer*, 545 N.E.2d 27, 29 (Ind. Ct. App. 1989). Once a stipulation is entered into between the parties, the facts so stipulated are conclusive upon both the parties and the tribunal, and the parties cannot challenge those facts on appeal. *Id.* Accordingly, Wife cannot now challenge the stipulated value of Husband's PSP, and the trial court did not abuse its discretion when it valued Husband's PSP at $52,925.

## 3. Division of Husband's Defined Benefit Plan

[31] Wife also argues that the trial court abused its discretion by failing to provide sufficient information for the division of Husband's PSP. Specifically, according to Wife, the trial court's order instructing Husband's counsel to divide Husband's PSP through a QDRO was not specific enough. As the sole authority in support of her argument, Wife directs us to *Evans v. Evans,* 946 N.E.2d 1200 (Ind. Ct. App. 2011). There, the trial court ordered the entry of a QDRO against the husband's employment pension plan to "adequately compensate [the wife] for her 50% interest in the net marital assets of the parties." *Id.* at 1202. After the husband's employer twice rejected proposed QDROs because they violated ERISA and the terms of the husband's pension plan, the trial court issued an order implementing an alternate property distribution. This Court affirmed the trial court's order as a clarification of its prior order, not an alteration, where the original plan was legally impossible to implement.

[32] However, the facts in this case are distinguishable from those in *Evans*. Specifically, in *Evans*, the husband's employer twice rejected two QDROs. Here, however, Wife does not allege that a QDRO has either been tendered to or rejected by Husband's employer. Under these circumstances, Wife's claim is simply not ripe for and we may not review it. *See Garau Germano P.C. v. Robertson*, 133 N.E.3d 161, 168 (Ind. Ct. App. 2019) (explaining both that a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or may not occur at all and that we may not review a claim that is not ripe).

### 4. Property Distribution

[33]  Finally, Wife argues that the trial court erred in dividing the parties' property. The disposition of marital assets is within the sound discretion of the trial court. *Hatten v. Hatten*, 825 N.E.2d 791, 794 (Ind. Ct. App. 2005), *trans. denied*. When we review a claim that the trial court improperly divided marital property, we must determine whether the trial court's decision constitutes an abuse of discretion. *Id.* In so doing, we consider only the evidence most favorable to the trial court's disposition of the property, without reweighing or assessing the credibility of witnesses. *Id.* An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law or disregards evidence of factors listed in the controlling statute. *Id.*

[34]  Here, although Wife's argument is somewhat unclear, she appears to argue that the trial court failed to distribute $18,000 that she alleges Husband had placed in the Chase account and subsequently either spent or hid. However, we agree with Husband that there is "no evidence presented by Wife to suggest that Husband frivolously spent or intentionally hid assets from her." (Husband's Br. at 19). Rather, as Husband points out, he opened the Chase account in 2015, and his paycheck was deposited directly into the account. However, most of the paycheck was subsequently deposited into the couple's Midwest account, which was the account that he used to pay most of the family's bills. Husband explained that he had also paid bills, such as $35,000 of mortgage payments, from the Chase account. Husband denied having any hidden or transferred

cash. We agree with Husband that Wife has "failed to produce any evidence that Husband [] concealed or hid[] marital funds or expended marital funds frivolously[.]" (Husband's Br. at 19). Rather, her argument is nothing more than an invitation for us to reweigh the evidence and assess witness credibility, which we cannot do. *See Hatten* at 794. The trial court did not abuse its discretion in distributing the parties' property.

[35] Affirmed.

Baker, J., and Robb, J., concur.